166 Cal.App.4th 1121 (2008)
ROBERT MARTINEZ et al., Plaintiffs and Appellants,
v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., Defendants and Respondents.
No. C054124.
Court of Appeals of California, Third District.
September 15, 2008.
As modified October 7, 2008.
CERTIFIED FOR PARTIAL PUBLICATION[*]
*1126 Immigration Reform Law Institute, Kris W. Kobach; Ropers, Majeski, Kohn & Bentley and Michael J. Brady for Plaintiffs and Appellants.
Sharon L. Browne and Ralph W. Kasarda for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.
Charles F. Robinson, Christopher M. Patti; Howard Rice Nemerovski Canady Falk & Rabkin, Ethan P. Schulman and Robert D. Hallman for Defendants and Respondents.
*1127 Munger, Tolles & Olson, Bradley S. Phillips, Fred A. Rowley, Jr., Gabriel P. Sanchez, Mark R. Yohalem; Lawyers' Committee for Civil Rights, Robert Rubin; Mexican American Legal Defense and Educational Fund, Cynthia Valenzquela, Nicholas Espiritu and Kristina Campbell for Alicia A., Gloria A., Marcos A., Mildred A., Enrique Boca, Nicole Doe, Collin Campbell, Alex Ortiz, Linda Lin Qian, Cesar Rivadeneyra, Jennifer Seidenberg, Improving Dreams, Equality, Access and Success at University of California, Davis, Improving Dreams, Equality, Access and Success of University of California, Los Angeles and National Immigration Law Center as Amici Curiae on behalf of Defendants and Respondents.

OPINION
SIMS, Acting P. J.
United States citizens who pay nonresident tuition for enrollment at California's public universities/colleges brought a lawsuit attacking a state statute (Ed. Code, § 68130.5[1]) which allows certain illegal aliens[2] to pay the less expensive resident tuition to attend these *1128 universities/colleges. Plaintiffs[3] filed a class action lawsuit against defendants Regents (Regents) of the University of California (UC), Trustees (Trustees) of the California State University System (CSU), Board of Governors (Board) of the California Community Colleges (CCC), UC President Robert C. Dynes (Dynes), CSU Chancellor Charles B. Reed (Reed), and CCC Chancellor Marshall Drummond (Drummond). Plaintiffs label their pleading as a class action complaint for damages; injunctive relief; declaratory relief; federal preemption; and violation of the United States Constitution (14th Amend.), California Constitution (art. I, § 7), federal statute (8 U.S.C. §§ 1621, 1623; 42 U.S.C. § 1983), and the Unruh Civil Rights Act (Civ. Code, § 51). Plaintiffs appeal from a judgment of dismissal following the trial court's sustaining of defendants' demurrers without leave to amend.
Numerous legal issues are addressed in this case. However, the most significant issue is whether California's authorization of in-state tuition to illegal aliens violates a federal law, title 8 of the United States Code (U.S.C.) section 1623, which provides as pertinent: "Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident."
The respondents argue the federal statute is not violated for two reasons:
1. Respondents say in-state tuition is not a "benefit" within the meaning of the federal law. For reasons we shall explain, we conclude in-state tuition, which is some $17,000 per year cheaper than out-of-state tuition at UC, is a "benefit" conferred on illegal aliens within the meaning of the federal law.
*1129 2. Respondents argue in-state tuition is not granted "on the basis of residence within a State" as required by federal law. Respondents point to the fact that in-state tuition for illegal aliens is based on a student's having attended a California high school for three or more years and on the student's having graduated from a California high school or having attained "the equivalent thereof." (§ 68130.5; see fn. 1, ante.) As we shall explain, the three-year attendance requirement at a California high school is a surrogate residence requirement. The vast majority of students who attend a California high school for three years are residents of the state of California. Section 68130.5 thwarts the will of Congress manifest in title 8 U.S.C. section 1623.
We shall conclude the trial court erred in determining the complaint failed as a matter of law. We shall reverse the judgment of dismissal and allow the case to proceed in the trial court.[4]

BACKGROUND
The complaint, filed December 14, 2005, alleged as follows:
Plaintiffs are United States citizens from states other than California and are students, or tuition-paying parents of students, enrolled after January 1, 2002, in a course of study for an undergraduate or graduate degree at a California public university or college, who allege they have been illegally denied exemption from nonresident tuition under section 68130.5,[5] which gives the benefit of resident tuition to illegal aliens.
*1130 Plaintiffs do not claim they attended a California high school, as required to qualify for the section 68130.5 benefit. Rather, plaintiffs claim the attendance requirement is a de facto residence requirement, preempted by federal immigration law, which illegally discriminates against plaintiffs by denying them a benefit provided to illegal aliens.
The complaint alleged defendants engaged in an "Illegal Alien Tuition Scheme," granting illegal aliens a tuition exemption denied to nonresident United States citizens in violation of federal law. The complaint alleged defendants knew section 68130.5 violated and was preempted by federal law.
The complaint alleged upon information and belief that, during the fall 2005 term, undergraduate tuition and fees were:
For UC, $6,769 for a resident undergraduate, and $24,589 for nonresident undergraduates ($17,304 tuition plus other fees);
For CSU, a campus average of $3,164 for resident undergraduates, and $13,334 for nonresident undergraduates;
For CCC, $26 per unit for residents and $135 per unit for nonresidents, with the average student taking 15 units per semester.
Although section 68130.5 states it does not apply to UC unless the Regents make it applicable (§ 68134 ["No provision of this part shall be applicable to the University of California unless the Regents of the University of California, by resolution, make such provision applicable."]), plaintiffs' complaint alleged the Regents adopted section 68130.5 in Standing Order 110.2 after lobbying for legislation (§ 68130.7[6]) limiting their legal exposure (as well as the exposure of the other defendants) in the event of lawsuits.
*1131 The complaint also set forth legislative history and plaintiffs' legal conclusions regarding statutory interpretation, which we address in our discussion.
The complaint set forth 10 counts, as follows:
1. Violation of Title 8 U.S.C. section 1623:[7] Plaintiffs alleged it is an illegal alien's residence in California that entitles him or her to attend a California high school, and therefore section 68130.5 imposes a de facto durational residency requirement. Because section 68130.5 does not give the same benefit to United States citizens without regard to residence, the California statute violates and is preempted by title 8 U.S.C. section 1623 (fn. 7, ante) under the supremacy clause of the United States Constitution. (U.S. Const., art. VI, § 2.) Plaintiffs alleged under this and all counts that they "have been injured by having paid nonresident tuition while illegal aliens have been unlawfully exempt...."
2. Violation of Title 8 U.S.C. section 1621:[8] Exemption from nonresident tuition confers a benefit in violation of title 8 U.S.C. section 1621 (fn. 8, *1132 ante), and the California Legislature failed to provide affirmatively for such eligibility as specified in title 8 U.S.C. section 1621(d).
3. Title 42 U.S.C. Section 1983: Defendants Dynes, Reed, and Drummond, in their capacities as President or Chancellors, acting under color of state law, deprived out-of-state United States citizens the exemption from nonresident tuition granted to illegal aliens, in violation of the Fourteenth Amendment and title 8 U.S.C. section 1623.
4. Equal Protection (U.S. Const.): Plaintiffs are similarly situated with illegal alien beneficiaries of section 68130.5, because neither class is lawfully domiciled in California, yet plaintiffs are discriminated against in tuition rates.
5. Privileges and Immunities Clause (U.S. Const.): Section 68130.5 violates the privileges and immunities clause of the Fourteenth Amendment, denigrating United States citizens by treating them worse than illegal aliens.
6. Field Preemption: In addition to express preemption under title 8 U.S.C. section 1623, Education Code section 68130.5 is preempted by "field preemption," in that Congress occupies the field of immigration law, and section 68130.5 stands as an obstacle to Congress's objective.
7. Equal Protection (Cal. Const.): Section 68130.5 violates California's equal protection clause (Cal. Const., art. I, § 7), by denying out-of-state United States citizens an exemption from nonresident tuition that is granted to illegal aliens.
8. Unruh Civil Rights Act: Defendants violated section 68062[9] (which precludes illegal aliens from establishing residence in California) and discriminated against plaintiffs based on geographic origin as out-of-state United States citizens, in violation of Civil Code section 51.[10] Plaintiffs sought *1133 actual damages or statutory damages (Civ. Code, § 52) of $4,000 for each class member for each offense (each offense consisting of each unlawful tuition bill paid by each class member) plus $25,000 for each class member.
9. Injunctive Relief: Plaintiffs sought a preliminary and permanent injunction, enjoining defendants from denying to plaintiffs the exemption from nonresident tuition to which they are entitled by title 8 U.S.C. section 1623 (fn. 7, ante), enjoining defendants from enforcing section 68130.5 with respect to exempting illegal aliens from nonresident tuition, and enjoining defendants from discriminating against plaintiffs in favor of illegal aliens.
10. Declaratory Relief: Plaintiffs sought a judicial declaration that the illegal alien tuition scheme is preempted by federal law and violates the federal statutes, equal protection, the privileges and immunities clause, and the Unruh Civil Rights Act.
In addition to injunctive and declaratory relief, the complaint's prayer sought tuition reimbursement.
Defendants filed demurrers.
The demurrer of the Trustees, Reed, the Board, and Drummond (collectively Trustees/Board) argued (1) plaintiffs lacked standing to challenge section 68130.5 because they do not qualify for an exemption from nonresident tuition and cannot establish any compensable injury; (2) the federal laws do not create a private right of action in plaintiffs; (3) any damage claims should be dismissed because plaintiffs failed to submit a claim in compliance with the Government Claims Act (Gov. Code, § 900 et seq.); and (4) the Board and Drummond were improper parties.
The demurrer of the Regents and Dynes (collectively Regents) argued:
(1) The exemption from nonresident tuition is not a "benefit" within the meaning of the federal law; section 68130.5 does not confer the exemption on the basis of residence; to the extent the state statute confers a benefit on illegal aliens it is expressly authorized by title 8 U.S.C. section 1621(d), which allows a state affirmatively to provide for such eligibility; and Congress did not intend a complete ouster of state power.
(2) The title 42 U.S.C. section 1983 claim failed because the complaint did not allege deprivation of any right protected by the Constitution or laws of the United States.
*1134 (3) The equal protection claim failed because section 68130.5 does not discriminate on the basis of alienage and is rationally related to a legitimate government purpose.
(4) The privileges and immunities claim failed because section 68130.5 does not discriminate on the basis of citizenship, and resident tuition is not a privilege.
(5) The Unruh Civil Rights Act claim failed because the Unruh Civil Rights Act does not prohibit discrimination based on geographic origin, and a state may charge higher tuition for out-of-state students than to state residents and others.
(6) The ninth count for injunctive relief failed because a request for injunctive relief is not a cause of action.
(7) The 10th count for declaratory relief failed because a cause of action for declaratory relief may not simply restate other causes of action.
In addition to the two demurrers, the Regents filed a motion to strike from the complaint the request for tuition reimbursement; plaintiffs filed requests for judicial notice; and various persons (some of whom sought to proceed under fictitious names) filed a motion for leave to intervene.
After a hearing, the trial court took judicial notice of some but not all of plaintiffs' materials, sustained defendants' demurrers without leave to amend, denied as moot the motion to strike, denied the intervention motion, and denied as moot the motion to proceed under fictitious names. The trial court sustained the Regents' demurrer without leave to amend on all counts, except the third count alleging a federal civil rights violation (42 U.S.C. § 1983), as to which the court overruled the demurrer on the ground the count was based not on federal preemption (as asserted in the Regents' demurrer), but on alleged violation of title 8 U.S.C. sections 1621 and 1623. However, the court dismissed the third count (federal civil rights violation) as to all defendants on the ground stated in the demurrer of the Trustees/Boardthat the federal immigration statutes (8 U.S.C. §§ 1621, 1623) conferred no private right of action in plaintiffs and therefore could not support a federal civil rights claim. As to other grounds for demurrer asserted by the Trustees/Board, the trial court rejected defendants' argument that plaintiffs lacked standing (a ruling not challenged by defendants in their response to this appeal), sustained the demurrer without leave to amend as to the first three counts, and concluded it *1135 was unnecessary to rule on other grounds given the court's sustaining of the Regents' demurrer without leave to amend.
Plaintiffs objected to the proposed judgment on the ground the third count (42 U.S.C. § 1983) remained outstanding. The trial court overruled the objection and entered a judgment of dismissal, from which plaintiffs appeal.

DISCUSSION

I. Standard of Review

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, ... [t]he reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed `if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (Aubry v. Tri-City Hospital Dist. (1992) 2 Cal.4th 962, 966-967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)
(1) The rules of federal statutory interpretation are much the same as those used when construing California statutes; our primary function is to give effect to legislative intent. (Johnson v. United States (2000) 529 U.S. 694, 710, fn. 10 [146 L.Ed.2d 727, 120 S.Ct. 1795]; Black v. Department of Mental Health (2000) 83 Cal.App.4th 739, 747 [100 Cal.Rptr.2d 39].)

II., III.[*]
.............................................................

IV. Claimed Conflict Between State Statutes

Although not pleaded as a cause of action, plaintiffs argue defendants, by giving illegal aliens resident tuition under section 68130.5, violated section 68062 (fn. 9, ante), which bars illegal aliens from establishing residency for tuition purposes. Plaintiffs characterize this claim as one of illegal and unconstitutional discrimination because Regents of University of California v. *1136 Superior Court (1990) 225 Cal.App.3d 972 at page 981 [276 Cal.Rptr. 197] (Bradford), supposedly said a violation of section 68062 would constitute discrimination against citizens of sister states. However, this contention is really a claimed conflict between state statutes, which does not help plaintiffs, because section 68130.5, as the later enacted statute, would prevail. (Professional Engineers in California Government v. Kempton (2007) 40 Cal.4th 1016, 1038 [56 Cal.Rptr.3d 814, 155 P.3d 226].)
Bradford, supra, 225 Cal.App.3d at pages 980 through 981, held section 68062, subdivision (h), precludes illegal aliens from qualifying as California residents for college tuition purposes, and as so construed, did not violate equal protection. Bradford, supra, 225 Cal.App.3d at pages 981 through 982, observed a state cannot exclude illegal aliens from free public elementary and secondary schools (Plyler v. Doe (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382]), but said the heart of Plyler v. Doe was that the "stigma of illiteracy" would mark these children for the rest of their lives. (In contrast, it was said in Lister v. Hoover (7th Cir. 1983) 706 F.2d 796, 797, 805, a due process case, that the interest in lower college tuition is slight.)
Plaintiffs read too much into Bradford, supra, 225 Cal.App.3d 972, which said, in upholding the constitutionality of section 68062, that the state's legitimate interests in denying resident tuition to illegal aliens (i.e., policy matters for legislative determination) included the interest in avoiding discrimination against citizens of sister states. (225 Cal.App.3d at p. 981.)

Bradford does not invalidate section 68130.5.
(2) To the extent that section 68130.5, as a de facto residence statute, could be said to conflict with section 68062, the result would be, at most, an implied repeal of section 68062 as the earlier enacted statutea result which does not advance plaintiffs' case. Thus, when two state statutes are so inconsistent that there is no possibility of concurrent operation, the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature. (Professional Engineers in California Government v. Kempton, supra, 40 Cal.4th at p. 1038.) That defendants do not claim an implied repeal does not, as urged by plaintiffs, determine the matter.
We conclude plaintiffs fail to show they could amend the complaint to allege a viable claim that section 68130.5 constitutes discrimination in violation of section 68062.

*1137 V. Federal Preemption

A. General Principles

Preemption has been explained in various ways. The United States Supreme Court has said:
(3) "[S]tate law is pre-empted under the Supremacy Clause, U.S. Const., Art. VI, cl. 2,[[14]] in three circumstances. First, Congress can define explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
(4) "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a `scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress `touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.' [Citation.] Although [the United States Supreme Court] has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: `Where ... the field which Congress is said to have pre-empted' includes areas that have `been traditionally occupied by the States,' congressional intent to supersede state laws must be "`clear and manifest.'" [Citation.]
(5) "Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements [citation], or where state law `stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citations.]" (English v. General Electric Co. (1990) 496 U.S. 72, 78-79 [110 L.Ed.2d 65, 74, 110 S.Ct. 2270].)
(6) The United States Supreme Court in De Canas v. Bica (1976) 424 U.S. 351 [47 L.Ed.2d 43, 96 S.Ct. 933] held that a California statute (Lab. Code, § 2805), prohibiting an employer from knowingly employing illegal aliens at *1138 the expense of lawful resident workers, was not unconstitutional as a regulation of immigration and was not preempted by the Immigration and Nationality Act (8 U.S.C. § 1101 et seq.). De Canas articulated three tests to be used in determining whether a state statute related to immigration is preempted.
First, the court must determine whether the state statute is a "regulation of immigration" (i.e., a determination of who should or should not be admitted into the country and the conditions under which a legal entrant may remain). (De Canas v. Bica, supra, 424 U.S. at p. 356.) If the state statute regulates immigration, it is preempted because the power to regulate immigration is exclusively a federal power. (Ibid.) That aliens are subjects of a state statute does not necessarily constitute a "regulation of immigration." (Ibid.; see People v. Salazar-Merino (2001) 89 Cal.App.4th 590, 598-599 [107 Cal.Rptr.2d 313] [Pen. Code, § 114, imposing criminal penalties for using a false document to conceal true citizenship or resident alien status, was not preempted by federal immigration law].)
Second, even if the state statute does not regulate immigration, it is preempted if Congress manifested a clear purpose to effect a complete ouster of state power, including state power to promulgate laws not in conflict with federal laws, with respect to the subject matter which the statute attempts to regulate. (De Canas v. Bica, supra, 424 U.S. at p. 357.) An intent to preclude state action may be inferred where the system of federal regulation is so pervasive that no opportunity for state activity remains. (Ibid.) Third, a state law is preempted if it "`stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (Id. at p. 363.) A statute is preempted under this third test if it conflicts with federal law, making compliance with both state and federal law impossible. (Ibid.; Toll v. Moreno (1982) 458 U.S. 1 [73 L.Ed.2d 563, 102 S.Ct. 2977] [state university's policy of denying in-state status to domiciled nonimmigrant aliens holding G-4 visas, violated supremacy clause]; League of United Latin American Citizens v. Wilson (C.D.Cal. 1997) 997 F.Supp. 1244, 1253, 1256 (LULAC II) [held that Congress in federal legislation enacted in 1996 occupied the field of regulation of public postsecondary education benefits to aliens, thereby preempting portions of California initiative measure Proposition 187, including a provision denying public postsecondary education to illegal aliens]; League of United Latin American Citizens v. Wilson (C.D.Cal. 1995) 908 F.Supp. 755 (LULAC I) [other federal immigration law preempted portions of Proposition 187].)

*1139 B. Preemption by Title 8 U.S.C. Section J 623

Plaintiffs' principal argument is that title 8 U.S.C. section 1623 preempts section 68130.5. We agree they have stated a cause of action. The demurrer should have been overruled.
As indicated, title 8 U.S.C. section 1623 (fn. 7, ante) provides, "Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident."
Title 8 U.S.C. section 1623 was enacted in September 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA).[15] (Pub.L. No. 104-208, Div. C, § 505 (Sept. 30, 1996), 110 Stat. 3009-672.)
(7) Section 68130.5 (enacted by Stats. 2001, ch. 814, § 2) makes illegal aliens eligible for in-state tuition without affording in-state tuition to out-of-state United States citizens without regard to California residence.
Defendants argue there is no preemption problem, because section 68130.5 does not confer a "benefit" based on "residence" within the meaning of title 8 U.S.C. section 1623. We disagree.

1. Section 68130.5 Confers a "Benefit"

Defendants argue the term "benefit" in title 8 U.S.C. section 1623 is limited, because the federal statute refers to "amount," which means monetary payments, and in-state tuition does not involve the payment of any money to students. However, defendants cite no authority supporting their illogical assumption that "amount" must mean monetary payment to the beneficiary. The complaint alleges the benefit of in-state tuition is a calculable amount, and it would certainly appear to be so. We therefore reject defendants' argument that "benefit" in title 8 U.S.C. section 1623 means only the payment of money to the person being benefited.
*1140 (8) Even assuming for the sake of argument that title 8 U.S.C. section 1623 could be considered ambiguous as to the meaning of "benefit," the conference committee report, which is an authoritative source of congressional intent (Eldred v. Ashcroft (2003) 537 U.S. 186, 209-210, fn. 16 [154 L.Ed.2d 683, 123 S.Ct. 769]), stated, "This section provides that illegal aliens are not eligible for in-state tuition rates at public institutions of higher education." (H.R.Rep. No. 104-828, 2d Sess. (H.R. No. 2202, § 507) p. 240 (1996).) Thus, "benefit" in title 8 U.S.C. section 1623 includes in-state tuition.
Defendants also argue "benefit" in title 8 U.S.C. section 1623 should be given the same meaning as "benefit" in title 8 U.S.C. section 1621, which defendants interpret as being limited to money paid to students. Again, we disagree.
Thus, title 8 U.S.C. section 1621 defines "benefit" in part as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." (8 U.S.C. § 1621(c)(1)(B), italics added.)
Defendants maintain the term "postsecondary education" in title 8 U.S.C. section 1621 is modified by the language "for which payments or assistance are provided," such that Congress proscribes spending public funds for an illegal alien's college education but has not proscribed eligibility for an exemption from nonresident tuition, which involves no payment or direct financial assistance.
However, since the terms in title 8 U.S.C. section 1621 are separated by the word "or" (postsecondary education benefit "or" other similar benefit for which payments or assistance are provided by an agency or by appropriated funds), defendant's modification theory is implausible. Even assuming for the sake of argument that "postsecondary education" is modified by the language "for which payments or assistance are provided," in-state tuition constitutes assistance, and defendants fail to show otherwise.
Defendants apply their own gloss to the word "assistance," asserting it must be "direct financial assistance." To the extent this position considers the term "assistance" to be limited to direct financial aid, we observe the exclusion of illegal aliens from student financial aid is already covered in 20 U.S.C. section 1091, which states, "In order to receive any grant, loan, or work assistance under [provisions concerning student financial aid], a student *1141 must ... [¶] be a citizen or national of the United States, a permanent resident of the United States, able to provide evidence from the Immigration and Naturalization Service that he or she is in the United States for other than a temporary purpose with the intention of becoming a citizen or permanent resident, [or] a citizen of any one of the Freely Associated States." (20 U.S.C. § 1091(a)(5).) In California, illegal aliens are barred from receiving financial assistance in the form of, e.g., Cal Grant awards. (§§ 69433.9, 69535.)
Moreover, one of the cases cited by defendants defeats their position. Thus, California Rural Legal Assistance v. Legal Services Corp. (9th Cir. 1990) 917 F.2d 1171, said that the provision of legal services did not constitute "financial assistance" within the meaning of a federal statute (8 U.S.C. § 1255a) imposing a five-year ban on "financial assistance" to amnesty aliens (aliens who were allowed to legalize their status under the amnesty provisions of the Immigration Reform and Control Act of 1986). (917 F.2d at pp. 1172, 1175-1176.) CRLA expressly reached its conclusion because the federal statute used the more narrow language "financial assistance" rather than the broader term "assistance." (Id. at p. 1176.) Thus, CRLA does not help defendants here, where the federal statute (8 U.S.C. § 1621) uses the broader term "assistance."
Defendants' other cited authorities do not support their position. Defendants quote from Equal Access Educ. v. Merten (E.D.Va. 2004) 305 F.Supp.2d 585 (Merten), which said the federal law (of which 8 U.S.C. §§ 1621, 1623 are a part) addressed "only post-secondary monetary assistance paid to students or their households...." (305 F.Supp.2d at p. 605.) However, defendants take the quote out of context. Merten was not deciding the meaning of assistance in title 8 U.S.C. section 1621; it was rejecting the plaintiffs' argument that Virginia's policy of denying college admission to illegal aliens was preempted by a different federal statute (8 U.S.C. § 1642). Merten said, "the scheme PRWORA [8 U.S.C. § 1601 et seq.] creates pertains to benefits not at issue here. In the area of post-secondary education, PRWORA addresses only post-secondary monetary assistance paid to students or their households, not admissions to college or university." (Merten, supra, at p. 605.) Merten went on to make a point (cited to us in plaintiffs' reply brief) that the reasonable inference to draw from title 8 U.S.C. section 1623 is that public colleges need not admit illegal aliens at all, but if they do, the aliens cannot receive in-state tuition unless out-of-state United States citizens receive in-state tuition. (Merten, supra, 305 F.Supp.2d at p. 606.) Again, however, Merten was deciding an issue about preemption concerning admissions, not tuition. Thus, Merten has no bearing on the case before us.
*1142 Defendants cite Doe v. Wilson (1997) 57 Cal.App.4th 296 at page 299 [67 Cal.Rptr.2d 187], which said newly enacted title 8 U.S.C. section 1621 prohibited California from expending public funds to provide prenatal care to illegal aliens, and the state could enforce emergency regulations adopted to comply with the federal legislation. Nothing in Doe v. Wilson limits the scope of the federal law.
Defendants cite a law review article construing the federal law as excluding in-state tuition. (Ruge & Iza, Higher Education for Undocumented Students: The Case for Open Admission and In-State Tuition Rates for Students Without Lawful Immigration Status (2005) 15 Ind. Int'l. & Comp. L.Rev. 257, 267.) The law review article reflects nonauthoritative opinion, and we do not agree with it on this point.
(9) We conclude section 68130.5 confers a "benefit" within the meaning of title 8 U.S.C. sections 1621 and 1623.

2. Section 68130.5 Is Based on Residence

Defendants argue section 68130.5 does not condition eligibility for in-state tuition "on the basis of residence within a State" as stated in title 8 U.S.C. section 1623. We disagree.
(10) The meaning of "residence" may vary according to the context, but "residence" generally requires both physical presence and an intention to remain. (Martinez v. Bynum (1983) 461 U.S. 321, 330-331 [75 L.Ed.2d 879, 888, 103 S.Ct. 1838] [state residency requirement for admission to tuitionfree public schools did not violate federal equal protection clause]; 27B Cal.Jur.3d (2004) Domicile, §§ 2-3, pp. 617-619.) State domicile is a matter of state law. (Elkins v. Moreno, supra, 435 U.S. 647, 662, fn. 16 [55 L.Ed.2d 614, 626].)
(11) Under section 68062 (fn. 9, ante), illegal aliens are barred from establishing California residency for college/university in-state tuition purposes if they are precluded by federal law (8 U.S.C. § 1101) from establishing domicile in the United States. (Bradford, supra, 225 Cal.App.3d at p. 980 ["section 68062, subdivision (h), precludes undocumented alien students from qualifying as residents of California for tuition purposes"]; American Assn. of Women v. Board of Trustees (1995) 31 Cal.App.4th 702, 706 [38 Cal.Rptr.2d 15] [Bradford is binding on both UC and CSU].) Bradford, supra, 225 Cal.App.3d at page 981, recognized legitimate state interests in denying resident tuition to illegal aliens, including "the state's interests in not *1143 subsidizing violations of law; in preferring to educate its own lawful residents; in avoiding enhancing the employment prospects of those to whom employment is forbidden by law; in conserving its fiscal resources for the benefit of its lawful residents; in avoiding accusations that it unlawfully harbors illegal aliens in its classrooms and dormitories; in not subsidizing the university education of those who may be deported; in avoiding discrimination against citizens of sister states and aliens lawfully present; in maintaining respect for government by not subsidizing those who break the law; and in not subsidizing the university education of students whose parents, because of the risk of deportation if detected, are less likely to pay taxes." (Ibid.)
Bradford predated the enactment of section 68130.5, which on its face allows illegal aliens to qualify for resident tuition, purportedly without establishing residence.
(12) "Residence" within the meaning of the California tuition statutes means, "the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose." (§ 68062, subd. (b); see fn. 9, ante.) The student must couple physical presence in California with objective evidence of intent to make California the home for other than a temporary purpose. (Cal. Code Regs., tit. 5, § 54020 [community colleges].) The residence of an unmarried minor child is generally the residence of the parent with whom the child maintains his or her place of abode. (§ 68062, subds. (f)-(i).) This includes an unmarried minor alien, unless the child or parent is precluded by the Immigration and Nationality Act (8 U.S.C. § 1101 et seq.) from establishing United States domicile. (§ 68062, subds. (h)-(i).)
(13) A "resident" is "a student who has residence, pursuant to [section 68062] in the state for more than one year immediately preceding the residence determination date." (§68017.) A "nonresident" is a student who does not have residence in the state for more than one year preceding the determination date. (§ 68018.)
"A student classified as a nonresident shall be required, except as otherwise provided in this part, to pay, in addition to other fees required by the institution, nonresident tuition." (§ 68050.) The governing board shall adopt rules and regulations relating to the method of calculation of the amount of nonresident tuition, unless otherwise provided by law. (§ 68051.) Section 68052 (which does not apply to community colleges) states that, under no circumstance shall the level of nonresident tuition plus required fees fall below the marginal cost of instruction, unless state revenues and expenditures are substantially imbalanced due to unforeseen factors. (§ 68052.) At CSU, "Except as otherwise specially provided, an admission fee and rate of tuition *1144 fixed by the trustees shall be required of each nonresident student. The rate of tuition to be paid by each nonresident student ... shall not be less that three hundred sixty dollars ($360) per year. The rate of tuition paid by each nonresident student who is a citizen and resident of a foreign country and not a citizen of the United States, except as otherwise specifically provided, shall be fixed by the trustees and shall not be less than ... ($360) per year." (§ 89705.) The trustees may waive or reduce the fees of foreign citizens subject to limitations. (§§ 89705-89707.) Community college districts may exempt from nonresident tuition: Students taking six or fewer units, a limited number of citizen-residents of foreign countries with financial need, and students displaced by Hurricane Katrina. (§ 76140.)
Numerous exceptions to nonresident status existe.g., a student who remains in California after the parent has moved elsewhere (§ 68070); a self-supporting student actually present in California for more than a year with intention of acquiring residence (§ 68071); a student under the care of adults domiciled in California (§ 68073); a member of or a dependent of a member of the Armed Forces of the United States stationed in California on active duty (§§ 68074-68075); a graduate of a California school operated by the United States Bureau of Indian Affairs (§§ 68077, 68082); and amateur student athletes training in Chula Vista for the Olympics (§ 68083). Some exceptions to residence determinations are left to the discretion of the school's governing board, e.g., a state employee or child of such employee "may be entitled to resident classification, as determined by the governing boards, until he or she has resided in the state the minimum time necessary to become a resident" (§ 68079), and agricultural laborers and their dependent children may be classified as residents for community college purposes if labor was performed in California for at least two months per year in the preceding two years (§ 68100). Additionally, tuition and fees are excused at particular institutions for various persons, including the surviving spouse or child of a law enforcement officer or firefighter killed in the line of duty while a California resident (§ 68120), surviving dependents of California residents killed in the September 11, 2001, terrorist attacks (§ 68121).
Defendants argue the plain language of section 68130.5, on its face, does not condition the exemption from nonresident tuition on the basis of residence. However, the question is whether the statute confers a benefit on the basis of residence, not whether the statute admits such a benefit is being conferred.
(14) Section 68130.5, footnote 1, ante, allows illegal aliens to pay resident tuition for college (beginning with the 2001-2002 academic year) if they attended a California high school for three years and either graduated from a California high school or attained "the equivalent thereof." (Arguably, *1145 a high school diploma from a state other than California would be "equivalent" to graduation from a California high school, but for purposes of this appeal, it does not matter.)
The statute purports to impose other conditions, i.e., (1) an affidavit promising to apply for legalized status if the student ever becomes eligible for such status, and (2) enrollment at an accredited institution of higher education not earlier than the fall of 2001. However, these supposed conditions add nothing. Enrollment is necessarily a prerequisite to having to pay tuition at all. And, despite defendants' assertion that section 68130.5 requires students to take steps to legalize their status, the statute does not do so. It merely requires students to promise to take steps to legalize their status if they ever become eligible for legalization. This is an empty, unenforceable promise contingent upon some future eligibility that may or may not ever occur.
Indeed, the "condition" of attaining a California high school diploma or its equivalent does not add much, because it would seem such diploma or equivalent would generally precede admission to a California college or university regular program. (See, e.g., § 76000 [CCC]; Cal. Code Regs., tit. 5, § 40751 et seq. [CSU].) Nevertheless, we will consider the diploma/equivalency a condition of in-state tuition under section 68130.5.
Thus, the only real conditions imposed by section 68130.5 are that the student (1) attend a California high school for three years, and (2) graduate or attain the equivalent.
A reasonable person would assume that a person attending a California high school for three years also lives in California. Such an assumption would be reasonable, given that a school district is generally linked to residence. Thus, section 48200 states, "Each person between the ages of 6 and 18 years not exempted ... is subject to compulsory full-time education. Each person subject to compulsory full-time education [and not exempted]... shall attend the public full-time day school or continuation school or classes ... of the school district in which the residency of either the parent or legal guardian is located...." This statute "embodies the general rule that parental residence dictates a pupil's proper school district." (Katz v. Los Gatos-Saratoga Joint Union High School Dist. (2004) 117 Cal.App.4th 47, 57 [11 Cal.Rptr.3d 546] [under §48200, which tied school district enrollment to parental residence, district was required to enroll pupils residing at property, even though property was located only partly within the district's geographic boundaries].)
*1146 We therefore consider the language of section 68130.5 ambiguous as to whether it affords a benefit to illegal aliens based on residence.
Defendants argue section 68130.5 is not based on residence, because other statutes allow non-California residents (children from adjoining states or an adjoining country) to attend school in California. (§§ 48050-48051.) However, those statutes require the parents or the other state to reimburse the California school district for the total cost of educating the pupil. Thus, section 48050[16] authorizes a school district to admit as pupils to an elementary school or a high school, children living in an adjoining state, as long as an agreement is reached for the school district of the other state to reimburse the California school district for the entire cost of educating the pupil. Section 48051[17] authorizes residents of an adjoining foreign country (i.e., Mexico) to attend school in California, as long as they return home to Mexico every day, and as long as their parents or guardians reimburse the district for the cost of educating the person as provided in section 48052.[18]
*1147 We reject defendants' reliance on these statutes. Defendants ask us to believe that the Legislature enacted section 68130.5 to subsidize the college education of students who were not entitled to free or subsidized education in California's elementary/secondary schools. That makes no sense.
Along the same lines, defendants argue section 68130.5 does not benefit only illegal aliens, because the statute gives in-state tuition to students who are not illegal aliens. Examples include a United States citizen who attended high school in California but lived in another state after high school before enrolling in a California college/university; such a person would not be considered a California resident unless he or she has resided in California for at least one year before the residence determination date. (§§ 68017-68018.) However, it could also be said such a student receives the benefit of section 68130.5 based on prior California residence. Other examples given by defendants are (1) a student who attended boarding school in California while maintaining a residence in another state; (2) a minor financially dependent on parents who reside in another state (since a minor's residence is derived from that of his or her parents); (3) a lawful immigrant dependent student whose parents have returned to another country; and (4) an "undocumented" student whose parents were granted permanent residency through an amnesty program and who is awaiting acceptance of his or her own application for permanent residency.
However, even assuming these examples involve persons lawfully present in this country, the circumstance that section 68130.5 may benefit some people who are not illegal aliens does not save the statute from plaintiffs' preemption claims if the statute benefits illegal aliens in contravention of federal law. Moreover, we suspect, and a liberal construction of plaintiffs' complaint is that plaintiffs allege, the vast majority of students attending California high schools for three years live in California. Indeed, an Enrolled Bill Report of the Office of the Secretary for Education (which is part of the record on appeal and which is subject to judicial notice under Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc. (2005) 133 Cal.App.4th 26, 40-42 [34 Cal.Rptr.3d 520]) estimated that 5,000 to 6,000 "undocumented" students would qualify for section 68130.5's exemption from nonresident tuition, while "the number of boarding school and border area students in California who are expected to qualify for a nonresident tuition exemption under the provisions of this bill [Assembly Bill No. 540] is expected to be less than 500."[19] (Enrolled Bill Rep. on Assem. Bill No. 540, *1148 Off. of the Sect, for Education (2001-2002 Reg. Sess.) Oct. 3, 2001, p. 5, italics added.) Since this case comes to us at the demurrer stage, we do not refer to these figures as proven facts but merely observe that, if true, they would undermine defendants' insinuation that the statute was not designed to benefit illegal aliens.
(15) The wording of the California statute, requiring attendance at a California high school for three or more years, creates a de facto residence requirement. Or, as plaintiffs put it, if section 68130.5 requires an illegal alien to attend a California high school for three years in order to qualify for the exemption from nonresident tuition, then the state has effectively established a surrogate criterion for residence.[20] That section 68130.5 also incidentally benefits a few students other than resident illegal aliens is, in our view, irrelevant. Section 68130.5 manifestly thwarts the will of Congress expressed in title 8 U.S.C. section 1623, that illegal aliens who are residents of a state not receive a postsecondary education benefit that is not available to citizens of the United States. Thus, we reject defendants' reliance on the presumption of constitutionality of legislation. (Lockyer v. City and County of San Francisco (2004) 33 Cal.4th 1055, 1086 [17 Cal.Rptr.3d 225, 95 P.3d 459].)
(16) Defendants argue the Legislature expressly stated, in an uncodified section of the bill enacting section 68130.5: "This act, as enacted during the 2001-02 Regular Session, does not confer postsecondary education benefits on the basis of residence within the meaning of Section 1623 of Title 8 of the United States Code." (Stats. 2001, ch. 814, § 1.) Defendants cite Professional Engineers v. Department of Transportation (1997) 15 Cal.4th 543 [63 Cal.Rptr.2d 467, 936 P.2d 473], which said, "courts must give legislative findings great weight and should uphold them unless unreasonable or arbitrary...." (Id. at p. 569.) However, the Legislature's statement in this case was not a finding of fact, but a legal conclusion. As defendants acknowledge, the Legislature's interpretation is not dispositive. Indeed, the cited case also said in the same paragraph that "the deference afforded to legislative findings does `not foreclose [a court's] independent judgment of the facts bearing on an issue of constitutional law.'" (Id. at p. 569.) Ultimately, statutory interpretation is a judicial function. (Western Security Bank v. Superior Court (1997) 15 Cal.4th 232, 244 [62 Cal.Rptr.2d 243, 933 P.2d 507].)
Moreover, the remainder of the uncodified section reflects an intent to benefit illegal aliens living in California:
"(a) The Legislature hereby finds and declares all of the following:
*1149 "(1) There are high school pupils who have attended elementary and secondary schools in this state for most of their lives and who are likely to remain, but are precluded from obtaining an affordable college education because they are required to pay nonresident tuition rates.
"(2) These pupils have already proven their academic eligibility and merit by being accepted into our state's colleges and universities.
"(3) A fair tuition policy for all high school pupils in California ensures access to our state's colleges and universities, and thereby increases the state's collective productivity and economic growth.[[21]]
"(4) This act, as enacted during the 2001-02 Regular Session, allows all persons, including undocumented immigrant students who meet the requirements set forth in Section 68130.5 of the Education Code, to be exempt from nonresident tuition in California's colleges and universities.
"(5) [Statement that the statute does not confer benefits based on residence.]
"(b) It is the intent of the Legislature that:
"(1) A state court may award only prospective injunctive and declaratory relief to a party in any lawsuit interpreting Section 68130.5....
"(2) This act will have no impact on the ability of California's public colleges and universities to assess nonresident tuition on students who are not within the scope of this act." (Stats. 2001, ch. 814, § 1, italics added.)
A 2002 amendment deleted subdivision (b)(1) of the uncodified section, regarding remedy, and added codified section 68130.7: "If a state court finds that Section 68130.5, or any similar provision adopted by the Regents of the University of California, is unlawful, the court may order, as equitable relief, that the administering entity that is the subject of the lawsuit terminate any waiver awarded under that statute or provision, but no money damages, tuition refund or waiver, or other retroactive relief, may be awarded. In any action in which the court finds that Section 68130.5, or any similar provision adopted by the Regents of the University of California, is unlawful, the *1150 California Community Colleges, the California State University, and the University of California are immune from the imposition of any award of money damages, tuition refund or waiver, or other retroactive relief." (Stats. 2002, ch. 19, § 2.)
That section 68130.5 was enacted to benefit illegal aliens living in California is also apparent in the cognizable legislative history of section 68130.5, which includes references to prior attempts at similar legislation. We disregard plaintiffs' citation of newspaper articles attributing statements to legislators. (Mangini v. R. J. Reynolds Tobacco Co. (1994) 7 Cal.4th 1057, 1065 [31 Cal.Rptr.2d 358, 875 P.2d 73] [existence of newspaper article was irrelevant, and truth of its contents was not judicially noticeable].) We disregard plaintiffs' citation of a letter from James E. Hoist, general counsel to the UC Regents, because the trial court denied judicial notice of this letter (exhibit O to request for judicial notice) due to lack of evidence it was considered by the Legislature, and we have rejected plaintiffs' challenge to this ruling. We shall consider the following legislative history that was the subject of judicial notice by the trial court.
Thus, the Higher Education Committee analysis of Assembly Bill No. 540 (2001-2002 Reg. Sess.) (which became § 68130.5) summarized the bill as follows: "Qualifies long-term California residents, as specified, regardless of citizenship status, for lower `resident' fee payments at the [CCC] and the [CSU]." (Concurrence in Sen. Amends, to Assem. Bill No. 540 (2001-2002 Reg. Sess.) as amended Sept. 7, 2001, p. 1, italics added, cited by the parties as Higher Education Com. Analysis.) The same summary appears elsewhere in the legislative history. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 540 (2001-2002 Reg. Sess.) as amended Sept. 7, 2001, p. 1.) This description, which admits an intent to benefit residents, is telling. Defendants' assertionthat the summary merely illustrates the common understanding that most California high school graduates reside in the statedoes not help defendants' position.
We disagree, however, with plaintiffs' further, unnecessary assertion that the legislative analysis indicated the majority of students to be benefitted consider California their home. What the analysis said was, "According to the author, many of the students that would benefit under this measure are children of parents who have been granted amnesty by the federal government and are waiting for their own applications for citizenship to be accepted by the Immigration and Naturalization Service [INS]. The majority of these students consider California their home and are expected to become citizens." (Concurrence in Sen. Amends, to Assem. Bill No. 540 (2001-2002 Reg. Sess.) as amended Sept. 7, 2001, p. 3.) Thus, the analysis referred to a majority of a specific classchildren of parents who have amnesty.
*1151 The analysis also said:
"Previous legislation: This measure is similar to AB 1197 (Firebaugh) of 1999 which was passed by the Committee on Higher Education, Assembly, and Senate, but vetoed by the Governor. AB 1197 had a provision requiring the students to be in the process of obtaining citizenship in order to benefit from the in-state tuition. This is not a part of the current legislation.
"In his veto message, Governor Davis cited the [IIRIRA], by which undocumented aliens are ineligible to receive postsecondary education benefits based on state residence unless a citizen or national of the U.S. would be eligible for the same benefits without regard to their residence ([8 U.S.C.] Section 1623).[22]
"In response to the veto message, the Chief Legislative Counsel issued an opinion that AB 1197 did not violate federal law since it did not tamper with a student's residency status under federal law and because it excluded from out-of-state tuition exemptions foreign residents as specified in the United States Code." (Concurrence in Sen. Amends., to Assem. Bill No. 540 (2001-2002 Reg. Sess.) as amended Sept. 7, 2001, at pp. 3-4.)
Thus, the bill which became section 68130.5 was a second attempt to overcome a perceived conflict with federal law. Yet the content of section 68130.5 is not significantly different from the content of Assembly Bill No. 1197 (1999-2000 Reg. Sess.), which would have granted in-state tuition if the student (1) attended a California high school for at least three years; (2) graduated from a California high school; (3) enrolled in college within one year of high school graduation or on or before January 1, 2001; and (4) initiated an application to legalize his or her immigration status. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1197 (1999-2000 Reg. Sess.) as amended Jan. 4, 2000, p. 2.) Defendants say, without citation, that the later bill omitted a provision in the earlier bill expressly making eligible those aliens precluded from establishing California residency by section 68062.
Also consistent with our interpretation of section 68130.5 (though not cognizable legislative history of intent at the time § 68130.5 was enacted) is *1152 the legislative history of subsequently enacted section 68130.7 (fn. 6, ante), limiting defendants' legal exposure. A Senate Rules Committee analysis of Assembly Bill No. 1543 (2001-2002 Reg. Sess.) (which became § 68130.7) stated, "Current law (AB 540, Firebaugh and Maldonado, Chapter 814, Statutes of 2001), which took effect January 1, 2002, qualifies specified long-term California residents, regardless of citizenship status, for lower `resident' fee payments . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1543 (2001-2002 Reg. Sess.) as amended Jan. 24, 2002, p. 1, italics added.)
(17) We conclude section 68130.5 does, and was intended to, benefit illegal aliens on the basis of residence in California.

3. Section 68130.5 Is Preempted by Title 8 U.S.C. Section 1623

(18) Since California does not afford the same benefit to United States citizens from other states "without regard to" California residence, section 68130.5 conflicts with title 8 U.S.C. section 1623, which states, "an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State . . . for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident."
As indicated, state law is preempted to the extent that it actually conflicts with federal law, where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (English v. General Electric Co., supra, 496 U.S. at pp. 78-79 [110 L.Ed.2d 65, 74]; De Canas v. Bica, supra, 424 U.S. 351 [47 L.Ed.2d 43]; LULAC II, supra, 997 F.Supp. at p. 1253.)
(19) Section 68130.5 does not regulate immigration and therefore is not expressly preempted as a regulation of immigration. (De Canas v. Bica, supra, 424 U.S. at p. 356.)
However, Congress in title 8 U.S.C. section 1623 expressly limited the state's power to give in-state tuition to illegal aliens, and in that sense Congress manifested a clear purpose to oust state power with respect to the subject matter which the state statute attempts to regulate. (De Canas v. Bica, supra, 424 U.S. at p. 357.) Though not binding on us, we observe that a federal district court concluded with respect to title 8 U.S.C. section 1621 (fn. 8, ante), which we discuss post, that Congress has occupied the field of regulation of public postsecondary education benefits to aliens (and *1153 thus invalidated portions of California initiative measure Proposition 187). (LULAC II, supra, 997 F.Supp. at p. 1256.) The LULAC cases concluded that some provisions (i.e., requiring college admissions officers to report students suspected of being in the country illegally) were preempted because they amounted to determinations of who may and may not remain in this country (LULAC I, supra, 908 F.Supp. at p. 774), while other provisions (e.g., denying public postsecondary education to illegal aliens) were preempted because Congress had occupied the field of regulation of public postsecondary education (LULAC II, supra, 997 F.Supp. at p. 1256).
(20) It is impossible for defendants to comply with both state and federal requirements, because section 68130.5 conflicts with title 8 U.S.C. section 1623, in that the state statute allows the benefit to United States citizens from other states only if they attend a California high school for three years. Thus, the state statute does not afford the same benefit to United States citizens "without regard to" California residence, as required by title 8 U.S.C. section 1623.
Plaintiffs argue it is also impossible for illegal aliens to enjoy the benefits of section 68130.5 while complying with federal law. If they attend a California public university/college, they remain unlawfully present in the United States in violation of federal immigration law. "Federal law forbids aliens to enter the United States without applying for admission. (8 U.S.C. §§ 1101(a)(4), 1181(a), 1201.) Those who nonetheless succeed in doing so, or in overstaying their visas, are subject to arrest and deportation. (Id., §§ 1251, 1252, 1357.)" (Bradford, supra, 225 Cal.App.3d at p. 979.) Defendants respond that a finding of impossibility would preempt all legislation conferring any benefits on illegal immigrants, even emergency medical care. Defendants cite Lozano v. City of Hazleton (M.D.Pa. 2007) 496 F.Supp.2d 477 at page 498, as stating the single illegal act of entering this country without legal authorization does not strip individuals of all rights. We question plaintiffs' claim that the federal appellate court granted review. In any event, the case does not help defendants because title 8 U.S.C. section 1623 expressly forbids the particular right at issue in this case unless it is given to United States citizens without regard to residence (which § 68130.5 does not do).
Plaintiffs add that encouraging illegal aliens to stay in the United States is a potential criminal violation. (8 U.S.C. § 1324(a)(1)(A)(iv); U.S. v. Oloyede (4th Cir. 1992) 982 F.2d 133, 137; Incalza v. Fendi North America, Inc. (9th Cir. 2007) 479 F.3d 1005, 1009-1010 [8 U.S.C. § 1324a(a)(2), forbidding employers from knowingly employing illegal aliens, provides good cause for terminating employment, as defined by California labor law].) We *1154 presume for purposes of this appeal that title 8 U.S.C. section 1324 would not apply if section 68130.5 comported with title 8 U.S.C. sections 1621 and 1623.
(21) Section 68130.5 also falls within the principle of implied preemption in that it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (De Canas v. Bica, supra, 424 U.S. at p. 357 [47 L.Ed.2d 43].) The congressional objective was stated in title 8 U.S.C. section 1601:
"The Congress makes the following statements concerning national policy with respect to welfare and immigration:
"(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.
"(2) It continues to be the immigration policy of the United States that[¶] (A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and [¶] (B) the availability of public benefits not constitute an incentive for immigration to the United States. [¶] ... [¶]
"(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits."
Defendants quote from Day v. Bond (10th Cir. 2007) 500 F.3d 1127, where the court statedin the course of concluding out-of-state students lacked standing for an equal protection claimthat a Kansas statute (with language similar to the California statute) involved "a nondiscriminatory prerequisite for benefits under [the statute], regardless of the citizenship of the students." (Id. at p. 1135.) That statement does not help defendants on the issues of preemption and residence. Nor is defendants' position assisted by their assertion that nine states other than California (Illinois, Kansas, Nebraska, New Mexico, New York, Oklahoma, Texas, Utah, Washington) have statutes similar to section 68130.5.
Defendants cite case law holding federal law did not preempt state statutes. (Reyes v. Van Elk, Ltd. (2007) 148 Cal.App.4th 604, 617-618 [56 Cal.Rptr.3d 68] [federal immigration law did not preempt state prevailing wage law or statutes making immigration status irrelevant to liability under labor, housing, and civil rights laws]; Farmer Brothers Coffee v. Workers' Comp. Appeals Bd. (2005) 133 Cal.App.4th 533, 540 [35 Cal.Rptr.3d 23] [federal immigration law did not preempt workers' compensation law].) However, those cases *1155 indicated the state statuteswhich were designed for purposes such as discouraging unscrupulous employers from hiring illegal alienswere consistent with the ultimate goal of federal immigration law to control illegal immigration. (Reyes, supra, 148 Cal.App.4th at pp. 617-618; Farmer, supra, 133 Cal.App.4th at p. 540.) The same cannot be said of section 68130.5.
Defendants argue our interpretation (that § 68130.5 conflicts with 8 U.S.C. § 1623) effectively deletes from the federal statute the phrase "on the basis of residence within a State," thereby violating the principle of statutory construction to give effect to every word. To the contrary, our conclusion gives realistic effect to that phrase in the federal statute, resulting in preemption of the state statute which confers a benefit on the basis of residence.
Defendants cite a law review article that undocumented children are caught in a fierce and complicated debate; the federal government does little to deport them; and it makes little sense to maintain obstacles to their pursuit of a college education. These policy arguments are beyond the scope of this court's authority in this appeal. Such arguments should be directed to Congress.
We conclude plaintiffs have stated a viable claim that title 8 U.S.C. section 1623 preempts section 68130.5. Although this conclusion suffices to require reversal of the judgment, we consider the parties' other contentions to determine what other claims will be at issue upon remand.

C. Preemption by Title 8 U.S.C. Section 1621

Plaintiffs argue section 68130.5 is also preempted by title 8 U.S.C. section 1621. We agree they stated a viable claim.
As indicated, title 8 U.S.C. section 1621 (fn. 8, ante) provides in part: "(a) In general [¶] Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an [illegal alien] [¶] ... [¶] is not eligible for any State or local public benefit (as defined in subsection (c) of this section). [¶] . . . [¶] (c) . . . `State or local public benefit' [means] [¶] . . . [¶] (B) any . . . postsecondary education . . . benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government. [¶] . . . [¶] (d) . . . [¶] A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section only through the enactment of a State law after . . . [August 22, 1996], which affirmatively provides for such eligibility."
*1156 Title 8 U.S.C. section 1621 was enacted in August 1996 (shortly before 8 U.S.C. § 1623) as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRA or PRWORA). (Pub.L. No. 104-193, § 411 (Aug. 22, 1996), 110 Stat. 2268.)
As indicated, a federal district court has held that the PRA preempted portions of California initiative measure Proposition 187 denying certain services to illegal aliens, including provisions that excluded illegal aliens from public schools (elementary/secondary and postsecondary) and a provision requiring denial of public postsecondary education benefits to illegal aliens. (LULAC II, supra, 997 F.Supp. 1244; LULAC I, supra, 908 F.Supp. 755.)
As we have explained in our discussion of title 8 U.S.C. section 1621, "benefit" in title 8 U.S.C. section 1621 includes exemption from nonresident tuition.
(22) Title 8 U.S.C. section 1621 expressly preempts states from giving postsecondary education benefits to illegal aliensunless the state enacts a statute which "affirmatively provides" for such eligibility. The parties refer to this as a "savings clause" or "safe harbor." (23) The existence of a savings clause in federal legislation does not necessarily preclude a conclusion of conflict preemption. (Dowhal v. SmithKline Beecham Consumer Healthcare (2004) 32 Cal.4th 910, 926 [12 Cal.Rptr.3d 262, 88 P.3d 1].) However, to the extent the federal law expressly authorizes state legislation, Congress cannot have intended impliedly to preclude such action. (People v. Edward D. Jones & Co. (2007) 154 Cal.App.4th 627, 639 [65 Cal.Rptr.3d 130].)
What is the meaning of "affirmatively provides"? Plaintiffs argue it means the California Legislature must expressly refer to title 8 U.S.C. section 1621 and illegal aliens; otherwise, the word "affirmatively" is superfluous. Defendants argue "affirmatively" merely means explicitly rather than implicitly; no "magic words" are required; and section 68130.5 affirmatively provides for eligibility by referring to "person[s] without lawful immigration status." We agree with plaintiffs that something more is required.
Since "affirmatively provides" is ambiguous, we refer to the cognizable federal legislative historya conference report which stated, "Only the affirmative enactment of a law by a State legislature and signed by the Governor after the date of enactment of this Act, that references this provision [8 U.S.C. section 1621], will meet the requirements of this section. [¶] The phrase `affirmatively provides for such eligibility' means that the State law enacted must specify that illegal aliens are eligible for State or local benefits." (H.R.Rep. No. 104-725, 2d Sess., p. 383 (1996).)
*1157 We conclude the conference report supports plaintiffs' position that not only must the state law specify that illegal aliens are eligible, but the state Legislature must also expressly reference title 8 U.S.C. section 1621 (which was not done in the case of § 68130.5).
(24) We agree with plaintiffs that the federal law's requirements are not a trivial formality. The federal law forces any state that is contemplating the provision of benefits to illegal aliens to spell out that intent publicly and explicitly. Doing so places the public on notice that their tax dollars are being used to support illegal aliens. It is a matter of democratic accountability, forcing state legislators to take public responsibility for their actions.
(25) Here, the California Legislature in enacting section 68130.5 did not expressly reference title 8 U.S.C. section 1621. Moreover, even accepting defendants' view that "affirmatively" merely means explicitly rather than implicitly and does not require the statute to use the words "illegal aliens," section 68130.5 does its best to conceal the benefit to illegal aliens. Although section 68130.5 does indicate that illegal aliens are eligible, it does so in a convoluted manner. The statute starts out by saying a student "other than a nonimmigrant alien [as defined under federal law]" is exempt from nonresident tuition. This sounds like the California statute does not benefit aliens. Section 68130.5 then says that a person "without lawful immigration status" must swear he or she has filed an application to legalize his/her immigration status or will file "as soon as he or she is eligible to do so." This almost sounds like the student will become legalized. The reality, in contrast, is that it could very well be that these students will never be eligible for legal status. Thus, while we do not hold that title 8 U.S.C. section 1621 requires the state statute to use the words "illegal aliens," we conclude the language of section 68130.5 does not clearly put the public on notice that tax dollars are being used to benefit illegal aliens.
Additionally, while the uncodified section of the enactment stated section 68130.5 allows "undocumented immigrant students" to be exempt from nonresident tuition, the same uncodified section went on to disavow any conferring of benefits on the basis of residence within the meaning of title 8 U.S.C. section 1623. (Stats. 2001, ch. 814, § 1;[23] Stats. 2002, ch. 19, § 1.)
We conclude the California Legislature has not met the requirements of title 8 U.S.C. section 1621's "safe harbor" or "savings clause." We need not address plaintiffs' further suggestion that "affirmatively provides" in title *1158 8 U.S.C. section 1621 requires the state statute to use the words "illegal alien" or "alien who is not lawfully present in the United States."
Accordingly, plaintiffs have stated a cause of action that section 68130.5 is preempted by title 8 U.S.C. section 1621.

VI. Equal Protection

We next address whether plaintiffs stated a viable claim that section 68130.5 violates the equal protection clause of the Fourteenth Amendment (count four) and the California Constitution (art. I, § 7) (count seven), by denying to plaintiffs the postsecondary education benefits granted to illegal aliens living in California. Plaintiffs claim they are similarly situated with the illegal aliens in that neither class is recognized under law as "domiciled" in the state of California, yet illegal aliens are allowed a benefit denied to United States citizens from sister states. We shall conclude plaintiffs should be allowed leave to amend regarding equal protection.
Even assuming for the sake of argument that strict scrutiny applies, as urged by plaintiffs, plaintiffs provide no legal analysis of the legal term of art "domicile," and section 68130.5 does not, on its face, allow illegal aliens a benefit denied to United States citizens from sister states. United States citizens, like illegal aliens, can obtain the benefit of section 68130.5 by attending a California high school for three years and obtaining a high school diploma or its equivalent.
(26) We observe the high school attendance requirement of section 68130.5 is not troubling in and of itself, because a state may favor its own residents. "`[A] State has a legitimate interest in protecting and preserving. . . the right of its own bona fide residents to attend [its colleges and universities] on a preferential tuition basis.' [Citation.]" (Martinez v. Bynum, supra, 461 U.S. at pp. 327-328 [75 L.Ed.2d at p. 886], original second brackets.) Although a state cannot exclude illegal aliens from free public elementary and secondary schools (Plyler v. Doe, supra, 457 U.S. 202 [72 L.Ed.2d 886]), school districts "may require that illegal alien children, like any other children, actually reside in the school district before admitting them to the schools. A requirement of de facto residency, uniformly applied, would not violate any principle of equal protection' . . . . [¶] A bona fide residence requirement, appropriately defined and uniformly applied, furthers the substantial state interest in assuring that services provided for its residents are enjoyed only by residents. Such a requirement with respect to attendance in public free schools does not violate the Equal Protection Clause of the Fourteenth Amendment. [Fn. omitted.]" (Martinez v. Bynum, supra, 461 U.S. at p. 328 [75 L.Ed.2d at pp. 886-887].) Similarly, Bradford, supra, 225 *1159 Cal.App.3d at pages 980 through 981, held there was no equal protection violation in section 68062, subdivision (h), which precluded illegal aliens from qualifying as California residents for tuition purposes. Bradford, supra, at pages 981 through 982, observed the heart of Plyler v. Doe, supra, 457 U.S. 202 (requiring states to educate illegal aliens at the elementary and secondary school levels) was that the "stigma of illiteracy" would mark these children for the rest of their lives.
Plaintiffs claim they alleged that some California colleges/universities have implemented section 68130.5 to deny eligibility to all United States citizens. Defendants respond plaintiffs did not allege this "as applied" challenge in their complaint and may not do so for the first time on appeal. However, plaintiffs, in their brief opposing the demurrer said: "Defendants argue that § 68130.5 withstands equal protection scrutiny because some U.S. citizens at some institutions of higher education have received benefits under the former [sic]." Plaintiffs added a footnote that, "Defendants are flatly wrong in arguing that there is no equal protection violation because in-state tuition benefits are being provided to certain non-resident U.S. citizens. By their own admission, Defendants are denying such benefits to non-resident U.S. citizens. [Citation to discovery response.] Evidence of this will be provided at trial."
The cited discovery response does not support the allegation. However, at the demurrer stage, plaintiffs are not required to prove their allegations. Plaintiffs should be allowed leave to amend if they show a reasonable possibility that defects can be cured by amendment. (Aubry v. Tri-City Hospital Dist., supra, 2 Cal.4th at pp. 966-967.)
We conclude that, on remand, the trial court shall give plaintiffs the opportunity to amend their complaint as to the equal protection claim. We need not address plaintiffs' argument that the state cannot have a rational basis for subsidizing the higher education of persons who by virtue of their illegal alien status may be unable to work legally in the state.

VII. Privileges and Immunities

Plaintiffs maintain their fifth count stated a viable claim that section 68130.5 contravenes the privileges and immunities clause of the Fourteenth Amendment, section 1, which provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States...." Plaintiffs' theory, as alleged in the complaint, was that, "By making illegal aliens who possess no lawful domicile in the state of California eligible for in-state tuition rates, while denying this benefit to U.S. citizens whose lawful domicile is outside California, the state of California has *1160 denigrated U.S. citizenship and placed U.S. citizen Plaintiffs in a legally disfavored position compared to that of illegal aliens." The complaint cited section 5 of the Fourteenth Amendment, which provides, "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." The complaint alleged Congress exercised this power by enacting title 8 U.S.C. section 1623.
The trial court dismissed this count based on Kirk v. Regents of University of California, supra, 273 Cal.App.2d 430, which said, "the privileges and immunities clause does not guarantee [a student from Ohio who married a California resident and moved to California] the right to attend the university for the same fee as that charged to persons who have met the one-year residence requirement." (Id. at pp. 444-445.)
Given the complaint's allegations, this reason is invalid.
That in-state tuition is conferred by state rather than federal law does not defeat the privileges and immunities claim here, where plaintiffs allege a violation of their rights under federal law, 8 U.S.C. section 1623.
Defendants' response on this point is that section 68130.5 applies equally to United States citizens and illegal aliens. We have rejected this view in our discussion of preemption.
Accordingly, the demurrer should be overruled as to the privileges and immunities claim. We need not address plaintiffs' invocation of a different constitutional provision regarding privileges and immunities which was not alleged in the complaint.

VIII. Due Process Taking of Property

Plaintiffs contend defendants' illegal and discriminatory conduct operated as an illegal extraction of excessive tuition from plaintiffs and constituted a taking of property without due process of law under the federal and California Constitutions. No such claim was asserted in the complaint, and we see no reason for leave to amend.
Plaintiffs fail to show they could amend the complaint to add a viable takings claim. They cite authority for the general proposition that a plaintiff deprived of a property right without due process is entitled to compensation under the Fourteenth Amendment and the California Constitution. Plaintiffs cite Lister v. Hoover, supra, 706 F.2d 796, for the supposed proposition that the right to lower tuition constituted a property interest. However, the only issue in Lister was whether due process required the University of Wisconsin *1161 to give written reasons for its denial of student requests to be classified as state residents for tuition purposes. (Id. at p. 797.) In Lister, no one disputed that the plaintiffs' claimed entitlement to lower tuition constituted a property interest; the question was what process was due. (Id. at p. 798.) The reviewing court said the interest was slight, and due process did not require the university to give written reasons for its denial. (Id. at pp. 797, 805.)
Plaintiffs' citation of authority that they have a contractual relationship with defendants adds nothing to their constitutional claims.
We conclude plaintiffs fail to show they should be given leave to amend to assert a due process claim based on the taking of their property.

IX. Unruh Civil Rights Act

Plaintiffs contend they adequately pleaded a claim under the Unruh Civil Rights Act (Civ. Code, § 51), in that they are American citizens from states other than California who are being discriminated against on the basis of national origin (reverse discrimination) and geographic origin. We shall conclude plaintiffs fail to show grounds for reversal regarding the Unruh Civil Rights Act claim.
Civil Code section 51, subdivision (b), provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."
Section 68130.5 does not discriminate against plaintiffs on the basis of national origin. Plaintiffs are denied the exemption from nonresident tuition, not because they are United States citizens, but because they have not attended high school in California. However, plaintiffs claim the effect of section 68130.5 is reverse discrimination against United States citizens from states other than California (geographic origin) and in favor of illegal aliens.
(27) The Unruh Civil Rights Act must be construed liberally to carry out its purpose of compelling recognition of the equality of all persons receiving services offered by business establishments. (Angelucci v. Century Supper Club (2007) 41 Cal.4th 160, 167 [59 Cal.Rptr.3d 142, 158 P.3d 718].) Although Civil Code section 51 does not mention geographic origin, the enumerated categories in the Unruh Civil Rights Act are "`illustrative rather *1162 than restrictive.'" (Koebke v. Bernardo Heights Country Club (2005) 36 Cal.4th 824, 839 [31 Cal.Rptr.3d 565, 115 P.3d 1212].) Nevertheless, the enumerated categories set forth the type of categories that will fall within the scope of the statute. (Id. at p. 841.) The common element of the enumerated categories and those added by judicial construction is they "`involve personal. . . characteristicsa person's geographical origin, physical attributes, and personal beliefs.'" (Id. at pp. 841, 842-843.) Koebke held the version of the Unruh Civil Rights Act in effect at that time extended to prohibit discrimination in favor of married couples and against domestic partners. (Ibid.) Thus, Koebke did not, as plaintiffs claim, extend the Unruh Civil Rights Act to geographic origin. Cases are not authority for propositions not decided. (Santisas v. Goodin (1998) 17 Cal.4th 599, 620 [71 Cal.Rptr.2d 830, 951 P.2d 399].)
Plaintiffs' position finds indirect support in Bradford, supra, 225 Cal.App.3d 972, which heldbefore enactment of section 68130.5that section 68062 (fn. 9, ante) precluded illegal aliens from qualifying as California residents for tuition purposes. (225 Cal.App.3d at p. 980.) Among the state's legitimate interests in denying resident tuition to illegal aliens was the interest "in avoiding discrimination against citizens of sister states . . . ." (Id. at p. 981.)
However, Bradford was not an Unruh Civil Rights Act case. We disregard plaintiffs' unsupported assertion, raised for the first time in the reply brief, that the doctrine of collateral estoppel bars defendants, who were parties in the Bradford case, from denying that discrimination has occurred.
Defendants argue the Unruh Civil Rights Act prohibits only "arbitrary discrimination," and defendants' actions in applying a statute (§ 68130.5) enacted by the Legislature cannot be considered arbitrary discrimination, since the Legislature has specifically permitted public colleges and universities to charge non-resident tuition and to exempt certain persons from the requirement of paying nonresident tuition.
Defendants have the better argument, particularly since section 68130.7 (fn. 6, ante) limits the remedy available in the event of invalidation of section 68130.5. The money damages available under the Unruh Civil Rights Act (Civ. Code, §§ 52, 52.1, subd. (b)) are barred by section 68130.7 (fn. 6, ante), which prohibits monetary damages if a court finds section 68130.5 unlawful.
We conclude plaintiffs fail to show grounds for reversal regarding the Unruh Civil Rights Act claim (count eight).

*1163 X. Discrimination (Cal. Const., Art. I, § 31)
Although not alleged in the complaint, plaintiffs claim they argued at the hearing on the demurrer (no transcript appears in the record on appeal) that they have a viable claim under California Constitution, article I, section 31, which was adopted by Proposition 209 in 1996, and which provides in part that "[t]he State [expressly including the public university system] shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (Italics added.) This self-executing provision states the remedies are the same as are otherwise available for violations of California antidiscrimination law. (Cal. Const., art. I, § 31, subds. (g)-(h).)
Plaintiffs argue illegal aliens who receive the in-state tuition benefit under section 68130.5 are by necessity foreign nationals, and therefore they receive preference based on their national origin. Plaintiffs also argue they themselves are the objects of reverse discrimination based on their national origin, i.e., American citizens from out of state.
However, plaintiffs fail to persuade us that "national origin" includes alienage/citizenship.[24]
(28) Proposition 209 was intended to reinstitute in California an interpretation of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000a et seq.) that preference to any group constitutes inherent inequality, however it is rationalized. (Hi-Voltage Wire Works, Inc. v. City of San Jose (2000) 24 Cal.4th 537, 561 [101 Cal.Rptr.2d 653, 12 P.3d 1068].) In interpreting title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.; title VII), the United States Supreme Court concluded "national origin" did not include alienage/citizenship. (Espinoza v. Farah Mfg. Co. (1973) 414 U.S. 86, 88 [38 L.Ed.2d 287, 291, 94 S.Ct. 334].) "The term `national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." (Ibid.) "Congress did not intend the term `national origin' to embrace citizenship requirements." (Id. at p. 89.) "Certainly it would be unlawful for an employer to discriminate against aliens because of race, color, religion, sex, or national originfor example, by hiring aliens of Anglo-Saxon background but refusing to hire those of Mexican or Spanish ancestry. Aliens are protected from illegal discrimination *1164 under the Act, but nothing in the Act makes it illegal to discriminate on the basis of citizenship or alienage." (Id. at p. 95.)
Plaintiffs cite federal cases allowing American citizens to pursue title VII claims alleging they were terminated from employment solely because they were born in the United States. However, plaintiffs fail to discuss these cases. None of these cases said "national origin" included alienage/citizenship, and none helps plaintiffs. Thus, the parties in Chaiffetz v. Robertson Research Holding, Ltd. (5th Cir. 1986) 798 F.2d 731an American employee of a Texas subsidiary of a British parent corporationagreed that "national origin" in title VII includes American citizens. (Chaiffetz, at pp. 732-733.) The appellate court held the district court erroneously found a legitimate, nondiscriminatory reason for the dismissal. (Ibid.) The appellate court reversed on that ground but added that the district court did not need to consider on remand the plaintiff's equal protection claim under title 42 U.S.C. section 1981 because, although that statute covers alienage, in America discrimination against Americans can never be discrimination based on a alienage. (Chaiffetz, at p. 735.) Plaintiffs do not discuss this latter point. Bilka v. Pepe's Inc. (N.D.Ill. 1985) 601 F.Supp. 1254, held an employee could pursue a claim of national origin discrimination, where the American employee alleged he was fired for teaching the Mexican workers English and talking about unions, though the court expressed no view as to whether being fired for having "American ideas" was the same as being fired for being born American. (Id. at p. 1258, fn. 7.) Thomas v. Rohner-Gehrig & Co. (N.D.Ill. 1984) 582 F.Supp. 669, held a complaint alleging that the plaintiffs were discharged by their employer (a Swiss-owned company incorporated in New York) solely because they were born in the United States, sufficiently stated a title VII cause of action based on national origin discrimination. (Thomas, at pp. 674-675.) Thus, none of these cases helps plaintiffs here.
We conclude plaintiffs fail to show a viable claim for violation of California Constitution, article I, section 31.

XI. Injunctive and Declaratory Relief

Plaintiffs summarily argue they adequately pleaded claims for injunctive and declaratory relief. Given our foregoing conclusions, we agree.
In summary, the demurrer was improperly sustained as to the preemption and privileges and immunities claims, and leave to amend should be granted as to the equal protection claim.

*1165 DISPOSITION
The judgment is reversed. Plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)
Raye, J., and Hull, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rule 8.1110, this is certified for publication with the exception of parts II. and III. of the Discussion.
[1] Undesignated statutory references are to the Education Code.

Section 68130.5 provides: "Notwithstanding any other provision of law: [¶] (a) A student, other than a nonimmigrant alien within the meaning of paragraph (15) of subsection (a) of Section 1101 of Title 8 of the United States Code, who meets all of the following requirements shall be exempt from paying nonresident tuition at the California State University and the California Community Colleges: [¶] (1) High school attendance in California for three or more years. [¶] (2) Graduation from a California high school or attainment of the equivalent thereof. [¶] (3) Registration as an entering student at, or current enrollment at, an accredited institution of higher education in California not earlier than the fall semester or quarter of the 2001-02 academic year. [¶] (4) In the case of a person without lawful immigration status, the filing of an affidavit with the institution of higher education stating that the student has filed an application to legalize his or her immigration status, or will file an application as soon as he or she is eligible to do so.
"(b) A student exempt from nonresident tuition under this section may be reported by a community college district as a full-time equivalent student for apportionment purposes.
"(c) The Board of Governors of the California Community Colleges and the Trustees of the California State University shall prescribe rules and regulations for the implementation of this section.
"(d) Student information obtained in the implementation of this section is confidential."
[2] Defendants prefer the term "undocumented immigrants." However, defendants do not cite any authoritative definition of the term and do not support their assertion that the terms "undocumented immigrant" and "illegal alien" are interchangeable. We consider the term "illegal alien" less ambiguous. Thus, under federal law, an "alien" is "any person not a citizen or national of the United States." (8 U.S.C. § 1101(a)(3).) A "national of the United States" means a United States citizen or a noncitizen who owes permanent allegiance to the United States. (8 U.S.C. § 1101(a)(22).) Under federal law, "immigrant" means every alien except those classified by federal law as nonimmigrant aliens. (8 U.S.C. § 1101(a)(15).) "Nonimmigrant aliens" are, in general, temporary visitors to the United States, such as diplomats and students who have no intention of abandoning their residence in a foreign country. (8 U.S.C. § 1101(a)(15)(F), (G); Elkins v. Moreno (1978) 435 U.S. 647, 664-665 [55 L.Ed.2d 614, 627-628, 98 S.Ct. 1338] [under pre-1996 law, held the question whether nonimmigrant aliens could become domiciliaries of Maryland for purposes of in-state college tuition was a matter of state law].) The federal statutes at issue in this appeal refer to "alien[s] who [are] not lawfully present in the United States." (8 U.S.C. §§ 1621(d), 1623(d).) In place of the cumbersome phrase "alien[s] who [are] not lawfully present," we shall use the term "illegal aliens."
[3] The named plaintiffs are Robert Martinez, Cory McMahon, Onson Luong, Scott Nass, Justin Rabie, Mark Hammes, Steven Hammes, David Hammes, Ash Caloustian, Aaron Dallek, Soleil Teubner, Mara McDermott, Adam Anderson, Demyan Drury, Casey Meguro, Chaning Jang, Kyle Dozeman, Kellan Didier, James Deutsch, Patrick Bilbray, Briana Bilbray, Brian Bilbray, Corey Robertson, Daniel Alameda, Dan Goldberg, Tim Kozono, Joseph Konrad, David Taylor, Suzanne Kattija-Ari, Justine Smith, Amanda Hildebrand, Aaron Malone-Stratton, Pamela Stratton, Michal [sic] Bulmash, Jimmy Davault, III, Matt Bittner, Antwann Davis, Arrington Dennison, Kathryn Jelsma, Emily Grant, Peter Shea, and Adam Thomson.
[4] Pacific Legal Foundation filed an amicus curiae brief in favor of plaintiffs. An amicus curiae brief in favor of defendants was filed by Alicia A., Gloria A., Marcos A., Mildred A., Enrique Boca, Nichole Doe, Collin Campbell, Alex Ortiz, Linda Lin Qian, Cesar Rivadeneyra, Jennifer Seidenberg; Improving Dreams, Equality, Access and Success at U.C. Davis; Improving Dreams, Equality, Access and Success of UCLA; and National Immigration Law Center.

We deny as unnecessary Pacific Legal Foundation's requests for judicial notice (made in their amicus curiae brief) of records of the California Postsecondary Education Commission as assertedly showing that taxpayers, some of whom cannot afford to send their own children to college, subsidize the college education of students who pay in-state tuition. "The higher tuition charged nonresident students tends to distribute more evenly the cost of operating and supporting the University of California between residents and nonresidents attending the university [and] appears to be a reasonable attempt to achieve a partial cost equalization by collecting lower tuition fees from those persons who, directly or indirectly, have recently made some contribution to the economy of the state...." (Kirk v. Regents of University of California (1969) 273 Cal.App.2d 430, 444 [78 Cal.Rptr. 260].)
[5] The complaint alleges plaintiffs are United States citizens who have been classified under California law as "nonimmigrant aliens." This allegation does not make sense. United States citizens are not "aliens" at all. (8 U.S.C. § 1101(a)(3) ["The term `alien' means any person not a citizen or national of the United States."].) Nothing in California law defines "alien" differently. Plaintiffs contend they were illegally denied exemption from nonresident tuition under section 68130.5. Section 68130.5 states that a student, other than a "nonimmigrant alien" within the meaning of title 8 U.S.C. section 1101(a)(15), is exempt from paying nonresident tuition if he or she meets the requirements, e.g., high school attendance in California for three years, graduation from a California high school, etc. Plaintiffs allege this statute characterizes out-of-state United States citizens as "nonimmigrant aliens." In reviewing a demurrer, we do not accept as true allegations of legal conclusions. Section 68130.5 defines "nonimmigrant alien" with reference to federal law. Under the federal law, "nonimmigrant aliens" are generally aliens admitted to this country for temporary periods, including students, diplomats and their servants, etc., who intend to return to their homeland. (8 U.S.C. § 1101(a)(15).) Thus, given the allegation that plaintiffs are United States citizens, plaintiffs are not nonimmigrant aliens. We assume for purposes of this appeal that plaintiffs were denied an exemption from nonresident tuition not because they were considered nonimmigrant aliens, but because they did not attend a California high school for three years and attain a California high school diploma or equivalent.
[6] Section 68130.7 provides: "If a state court finds that Section 68130.5, or any similar provision adopted by the Regents of the University of California, is unlawful, the court may order, as equitable relief, that the administering entity that is the subject of the lawsuit terminate any waiver awarded under that statute or provision, but no money damages, tuition refund or waiver, or other retroactive relief, may be awarded. In any action in which the court finds that Section 68130.5, or any similar provision adopted by the Regents of the University of California, is unlawful, the California Community Colleges, the California State University, and the University of California are immune from the imposition of any award of money damages, tuition refund or waiver, or other retroactive relief."
[7] Title 8 U.S.C. section 1623 provides: "(a) In general [¶] Notwithstanding any other provision of law, an alien who is not lawfully present in the United States shall not be eligible on the basis of residence within a State (or a political subdivision) for any postsecondary education benefit unless a citizen or national of the United States is eligible for such a benefit (in no less an amount, duration, and scope) without regard to whether the citizen or national is such a resident. [¶] (b) Effective date. [¶] This section shall apply to benefits provided on or after July 1, 1998."
[8] Title 8 U.S.C. section 1621 provides: "(a) In general. [¶] Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not[¶] (1) a qualified alien (as defined in section 1641 of this title), [¶] (2) a nonimmigrant under the Immigration and Nationality Act [8 U.S.C.A. § 1101 et seq.], or [¶] (3) an alien who is paroled into the United States under section 212(d)(5) of such Act [8 U.S.C.A. § 1182(d)(5)] for less than one year, [¶] is not eligible for any State or local public benefit (as defined in subsection (c) of this section).

"(b) [Exceptions for specified health care, emergency disaster relief, health assistance, and program services necessary for protection of life or safety.]
"(c) `State or local public benefit' defined [¶] (1) Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term `State or local public benefit' means [¶] ... [¶] (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government. [¶].... [¶]
"(d) State authority to provide for eligibility of illegal aliens for State and local public benefits. [¶] A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section only through the enactment of a State law after ... [August 22, 1996], which affirmatively provides for such eligibility." (Italics added.)
[9] Section 68062 provides: "In determining the place of residence the following rules are to be observed: [¶] (a) There can only be one residence. [¶] (b) A residence is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose. [¶] ... [¶] (f) The residence of the parent with whom an unmarried minor child maintains his or her place of abode is the residence of the unmarried minor child. [¶] ... [¶] (h) An alien, including an unmarried minor alien, may establish his or her residence, unless precluded by the Immigration and Nationality Act (8 U.S.C. [§] 1101, et seq.) from establishing domicile in the United States." (Italics added.)
[10] Civil Code section 51, subdivision (b), provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."
[*] See footnote, ante, page 1121.
[14] The supremacy clause provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.)
[15] This was shortly after enactment of title 8 U.S.C. section 1621 (fn. 8, ante), which we discuss post. Defendants agree title 8 U.S.C. section 1623 narrowed the authorization previously conferred on states by the earlier statute to make exceptions to the federal restrictions.
[16] Section 48050 provides: "The governing board of any school district may, with the approval of the county superintendent of schools, admit to the elementary and high schools of the district pupils living in an adjoining state which is contiguous to the school district. An agreement shall be entered into between the governing board and the governing board or authority of the school district in which the pupils reside providing for the payment by the latter of an amount sufficient to reimburse the district of attendance for the total cost of educating the pupil, including the total of the amounts expended per pupil for the current expenses of education, the use of buildings and equipment, the repayment of local bonds and interest payments and state building loan funds, capital outlay, and transportation to and from school.... The attendance of the pupils shall not be included in computing the average daily attendance of the class or school for the purpose of obtaining apportionment of state funds. In lieu of entering an agreement with the governing board or authority of the school district in which the pupil from the adjoining state resides, the governing board of the school district in this state may enter an agreement with the parent or guardian of the pupil on the same terms as is provided in this section."
[17] Section 48051 provides: "Any person, otherwise eligible for admission to any class or school of a school district of this state, whose parents are or are not citizens of the United States, whose actual and legal residence is in a foreign country adjacent to this state, and who regularly returns within a 24-hour period to said foreign country may be admitted to the class or school of the district by the governing board of the district."
[18] Section 48052 provides: "The governing board of the district shall, as a condition precedent to the admission of any person, under Section 48051, require the parent or guardian of such person to pay to the district an amount not more than sufficient to reimburse the district for the total cost of educating the person, inc[l]uding the total of the amounts expended per pupil for the current expenses of education, the use of buildings and equipment, the repayment of local bonds and interest payments and state building loan funds, capital outlay, and transportation to and from school.... The attendance of the pupils shall not be included in computing the average daily attendance of the class or school for the purpose of obtaining apportionment of state funds. The school district shall not be eligible for nonimmigrant or noncitizen reimbursement under the provisions of Chapter 11 (commencing with Section 42900) of Part 24 of Division 3 of this title, Article 2 (commencing with Section 56865) of Chapter 6 of Part 30 of this division for these students."
[19] The amicus curiae brief supporting defendants, filed by Alicia A. et al., asserts that in 2005 and 2006, 1,500 UC students qualified for section 68130.5 in-state tuition, of which only 390 students were undocumented. Plaintiffs assert the total number of illegal aliens paying in-state tuition throughout the college and university systems is over 25,000. We need not resolve factual disputes at this demurrer stage.
[20] We ask the same question that we posed to defendants' counsel at oral argument: "Could the Legislature enact a statute granting in-state tuition to every illegal alien whose parents maintained a post office box in California, without violating title 8 U.S.C. section 1623?" We think the answer is, "No."
[21] The parties dispute whether, and to what extent, this policy applies to illegal aliens unable to obtain lawful, gainful jobs in California. Kirk v. Regents of University of California, supra, 273 Cal.App.2d 430, said the state has a valid interest in providing tuition benefits "to those who have demonstrated by ... residence a bona fide intention of remaining here and who, by reason of that education, will be prepared to make a greater contribution to the state's economy and future." (Id. at p. 444.) However, Kirk did not involve illegal aliens.
[22] The trial court sustained a defense objection to the complaint's exhibit D: legislative history of the prior bill, which included the contents of the Governor's veto message expressing the view that the prior bill (which contained substantially the same language that was later enacted) would conflict with federal law unless the state gave the same benefit to out-of-state residents. The trial court said there was no evidence that the contents of the veto message of the prior bill was before the Legislature when it enacted section 68130.5 in Assembly Bill No. 540 (2001-2002 Reg. Sess.). However, the above quoted language from the legislative history of Assembly Bill No. 540 adequately conveyed the contents of the veto message concerning the prior bill.
[23] The uncodified section stated the enactment "allows all persons, including undocumented immigrant students who meet the requirements" to be exempt from nonresident tuition, but also stated the enactment "does not confer postsecondary education benefits on the basis of residence within the meaning of [8 U.S.C. section 1623]." (Stats. 2001, ch. 814, § 1.)
[24] Even plaintiffs' amicus curiae, Pacific Legal Foundation (PLF) is not persuaded. PLF filed an amicus curiae brief in support of plaintiffs on other grounds but argued plaintiffs are wrong about article I, section 31 of the California Constitution, and national origin does not include citizenship.